## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Sep 30 2016, 8:13 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Andrew J. Sickmann
Boston Bever Klinge Cross & Chidester
Richmond, Indiana

ATTORNEYS FOR APPELLEE

Gregory F. Zoeller
Attorney General of Indiana

Robert J. Henke
David E. Corey
Deputy Attorneys General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| In re the Termination of the Parent-Child Relationship of: A.H. & P.H. (Minor Children) and T.S. (Mother) and D.H. (Father) | September 30, 2016 |
| *Appellants-Respondents,* | Court of Appeals Case No. 89A01-1601-JT-53 |
| v. | Appeal from the Wayne Superior Court |
| The Indiana Department of Child Services, | The Honorable Darrin M. Dolehanty, Judge. |
| *Appellee-Petitioner* | Trial Court Cause Nos. 89D03-1509-JT-29 89D03-1509-JT-30 |

**Mathias, Judge.**

[1]   T.S. ("Mother") and D.H. ("Father") appeal the involuntary termination of their parental rights to minor daughter A.H. and minor son P.H (collectively "the Children"). Mother and Father raise one issue, which we restate as whether the State presented sufficient evidence to support the trial court's termination order.

[2]   We affirm.

## Facts and Procedural History

[3]   The Children were born on June 30, 2014[1] to Mother and Father. On August 15, 2014, the Children were removed from Mother's and Father's care by an emergency custody order after it was discovered that P.H.'s meconium tested positive for morphine and the Children were both experiencing symptoms of withdrawal. The Department of Child Services ("DCS") filed petitions alleging that the Children were Children in Need of Services ("CHINS") on August 19, 2014. At this time, the Children were placed in the care of their paternal grandmother.

[4]   On the same day, the trial court held an initial hearing and adjudicated the Children as CHINS based on Mother's and Father's admissions. In its September 16, 2014 dispositional order, the court ordered Mother and Father to participate in reunification services, which included: notifying the DCS case

---

[1] Children are fraternal twins.

manager of any arrest or criminal charges, keeping all appointments with DCS, Court Appointed Special Advocate (CASA)/Guardian ad litem (GAL), and service providers, not using or consuming illegal controlled substances, submitting to random drug screens with results being positive if failure to timely submit, completing a substance abuse assessment and following all recommendations, and attending all visitation with the Children.

[5] On October 9, 2014, DCS filed a petition for contempt due to lack of parental participation. The trial court held a hearing on the petition on October 27, 2014, and Mother and Father admitted that they had tested positive for drugs and failed to comply with the court's dispositional order. The court sentenced Mother and Father to each serve fourteen days in jail.

[6] The court held a review hearing on February 20, 2015, and found that Mother and Father continued to use drugs, failed to participate in services, and failed to notify DCS of their location for weeks at a time. Further, Father was arrested and incarcerated on armed robbery charges on April 29, 2015. On May 15, 2015, Mother overdosed on drugs while she was at paternal grandmother's home—a place she was not supposed to be. As a result, DCS removed the Children from paternal grandmother's care and placed them in a foster home.

[7] On August 12, 2015, the trial court held a review and permanency hearing where it changed the plan to termination and adoption. The court made this determination after discovering that Father was still incarcerated and that Mother was not routinely participating in visitation with Children and was not

complying with substance abuse counseling services. DCS filed its termination petitions on September 8, 2015. The trial court held an evidentiary hearing on DCS's termination petitions on December 8, 2015.

[8] Meridian Services clinical addiction counselor, Jessica Cate ("Cate") worked with Mother for a brief period of time. Cate stated that Mother never completed the twelve-week intensive outpatient treatment program, but when she did attend, she was receptive to feedback and participated in group discussions. Mother attempted to complete the program three times but was discharged each time based on her lack of attendance. Meridian Services clinical addiction counselor, Tom Pennington ("Pennington"), worked with Father twice at the intensive outpatient treatment program, but because of his failure to attend, Father was also discharged from the program. Pennington noted that Father had limited engagement when he did attend and that he had a significant need for substance abuse services.

[9] Family case manager, Emily Graham ("Graham"), knew Mother from a previous CHINS case dating back to May 2014 and became acquainted with Father in August 2014 after the Children were removed. Graham stated that Mother had voluntarily terminated her parental rights to another child involved in a prior CHINS case in June 2014.[2] Graham also noted Mother and Father's

---

[2] Apparently, a total of two prior CHINS cases involved two of Mother's other children. In the first CHINS case, the child was removed from Father's care, but DCS would not place the child with Mother due to her substance abuse issues. The second CHINS case involved Mother overdosing in February 2014 in front of child. That child's grandmother is now his guardian.

lack of participation in services. Father completed only the substance abuse assessment, while Mother was referred for substance abuse treatment as early as January 2013, but she began participatation in rehab services just before the termination hearing. Graham stated that Mother's original service provider cancelled all future visitation because Mother continuously missed visits with Children. Graham then held the visitation at the DCS office between June and September 2015, but Mother missed more visits than she attended.

[10] Graham stated that termination of parental rights is in the Children's best interests. She expressed that the Children were removed due to noncompliance with substance abuse and the situation has not been remedied. Mother only recently went to rehab, and Father maintains sobriety due to his incarceration. Graham noted that Mother has not shown consistently maintained sobriety, and before Father was incarcerated, he failed eight out of nine drug screens between August 2014 and February 2015. She stated that the Children are well bonded to their foster parents and call them "mama" and "dada." Tr. p. 53.

[11] Deborah Walcott ("Walcott") provided supervised visitation to Mother through the Extra Special Parents program. Walcott stated that she began providing Mother with visitation services twice per week in September 2015. Walcott reported that Mother interacted with the Children at the visits and never was under the influence of alcohol or drugs. Children's Bureau case worker, Tom Brazell ("Brazell") stated that he had been working with Father since August 2015 through the Engaging Father's Program, which focuses on improvement in fatherhood. Brazell testified that Father is always friendly, kind, considerate,

and ready to engage. Brazell also stated that Father has anger issues that he is working to remedy and has made progress during the time Brazell has worked with him.

[12] Mother reported that she recently completed inpatient rehab at Harbor Lights, which consisted of two weeks' inpatient treatment and one week of detox. She admitted that she had not successfully completed the substance abuse program at Meridian Services but recently enrolled again. Mother also noted that she plans to attend "90 meetings in 90 days" to maintain her sobriety. Tr. p. 89. Mother reported having a job lined up at Kroger and that she was waiting on an apartment at Carriage House but presented no verification of either employment or housing to the court. She also explained that the reason she terminated her parental rights to the child involved in one of the prior CHINS cases was because he had mental and behavioral issues that she could not handle, especially with her own substance abuse issues.[3]

[13] CASA Director Karen Bowen ("Bowen") also testified that termination of parental rights is in the best interests of the Children. Bowen noted that the Children were removed shortly after birth and were eighteen months old at the time of the termination hearing. Bowen emphasized the importance of the

---

[3] Mother has five children: (1) the oldest child lives with his father; (2) another child lives with paternal grandmother who has guardianship; (3) Mother voluntarily terminated parental rights to a child with mental and behavioral issues; and (4) the twins that are the subject of the trial court's termination order. It is not clear whether any of these children have the same father. However, from the record it appears that Father is only the biological father of the Children.

Children developing trust and having stability from their caregivers, which she believed Mother and Father could not provide. Bowen stated that Mother has a history of substance abuse and housing insecurity. Bowen expressed that three weeks of sobriety was not enough to indicate whether Mother intends to make a permanent lifestyle change. She further noted that Father remains incarcerated and only started participating in services after his incarceration. Like Graham expressed, Bowen stated that the Children are well bonded to their foster parents and the foster parents are able to meet their needs.

[14] On December 11, 2015, the trial court entered an order terminating Mother and Father's parental rights to the Children. Mother and Father now appeal.

## Discussion and Decision

[15] We have long had a highly deferential standard of review in cases involving the termination of parental rights. *In re D.B.*, 942 N.E.2d 867, 871 (Ind. Ct. App. 2011). We neither reweigh the evidence nor assess witness credibility. *Id.* We consider only the evidence and reasonable inferences favorable to the trial court's judgment. *Id.* Where the trial court enters findings of fact and conclusions thereon, we apply a two-tiered standard of review: we first determine whether the evidence supports the findings and then determine whether the findings support the judgment. *Id.* In deference to the trial court's unique position to assess the evidence, we will set aside a judgment terminating a parent-child relationship only if it is clearly erroneous. *Id.* Clear error is that which "leaves us with a definite and firm conviction that a mistake has been

made." *J.M. v. Marion Cnty. Office of Family & Children*, 802 N.E.2d 40, 44 (Ind. Ct. App. 2004), *trans. denied*.

[16] "The purpose of terminating parental rights is not to punish parents but to protect their children. Although parental rights have a constitutional dimension, the law allows for their termination when parties are unable or unwilling to meet their responsibility as parents." *In re S.P.H.*, 806 N.E.2d 874, 880 (Ind. Ct. App. 2004) (citation omitted). Indeed, parental interests must be subordinated to the child's interests in determining the proper disposition of a petition to terminate parental rights. *In re G.Y.*, 904 N.E.2d 1257, 1259 (Ind. 2009).

[17] Indiana Code section 31-35-2-4(b) provides that a petition to terminate parental rights must meet the following requirements:

> (2) The petition must allege:
>
> (B) that one (1) of the following is true:
>
>> (i) There is a reasonable probability that the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied.
>>
>> (ii) There is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the child.
>>
>> (iii) The child has, on two (2) separate occasions, been adjudicated a child in need of services;
>
> (C) that termination is in the best interests of the child; and
>
> (D) that there is a satisfactory plan for the care and treatment of the child.

[18] However, Indiana Code section 4(b)(2)(B) is written in the disjunctive; therefore, the trial court is required to find that only one prong of subsection (2)(B) has been established by clear and convincing evidence. *In re A.K.,* 924 N.E.3d 212, 220 (Ind. Ct. App. 2010). DCS must prove "each and every element" by clear and convincing evidence. *G.Y.*, 904 N.E.2d at 1261; Ind. Code § 31-37-14-2. Clear and convincing evidence need not establish that the continued custody of the parent is wholly inadequate for the child's very survival. *Bester v. Lake Cnty. Office of Family & Children*, 839 N.E.2d 143, 147 (Ind. 2005). Rather, it is sufficient to show by clear and convincing evidence that the child's emotional development and physical development are put at risk by the parent's custody. *Id.* If the court finds the allegations in a petition are true, the court shall terminate the parent-child relationship. Ind. Code § 31-35-2-8(a).

[19] Mother and Father argue that DCS failed to present sufficient evidence that they were unable to remedy the conditions and situation that led to Children's removal and that termination of their parental rights was in the Children's best interests. Specifically, Mother and Father claim that several of the trial court's findings do not support the two conclusions. The challenged findings are as follows:

> 22. Tom Brazell is a case worker with the Children's Bureau. He has worked with father, through an August 2015 referral from DCS. Mr. Brazell visits with father once each week, while father remains incarcerated. Mr. Brazell has been using an individual enrichment program referred to as "Being the Best Father You Can Be." The program focuses on the importance of fathers in a

child's life, and how to parent as a father. The program is administered through workbooks and discussion. Mr. Brazell has observed father to be appropriate, kind, considerate, and receptive.

29. The DCS has not requested that father submit to drug screens since he has been incarcerated.

30. Father's incarceration has also kept FCM Graham from being able to determine if father is able to apply skills he may have acquired as a result of the services being provided.

33. FCM Graham made arrangements for mother to participate in an inpatient substance abuse program, as early as January, 2015.[4] Mother did not participate in any inpatient program as a result of those referrals. Mother reports that she very recently attended an inpatient program through the Salvation Army, known as "Harbor Lights." Mother reported that the program consisted of one (1) week of "detox" and then two (2) weeks of inpatient therapy. Mother was very vague about the dates when she participated in this program, and no evidence was presented to verify mother's claim that she completed the program or completed it successfully.

39. Mother reports that she has been "sober" for forty-one (41) days.

Appellant's Br. at 24-26.

---

[4] Graham's testimony in the transcript indicates that Mother was offered substance abuse services as early as January 2013. *See* Tr. p. 49.

[20] Based on these findings, among others, the trial court concluded that: (1) DCS has shown by clear and convincing evidence, that it is a reasonable probability that the conditions that resulted in the children's removal from and placement outside of the home of the parents will not be remedied; and (2) clear and convincing evidence was presented to show that termination of parental rights is in the best interest of these children. Appellant's Br. at 26-27.

*A. Conditions that Led to Removal*

[21] When making a determination as to whether a reasonable probability exists that the conditions resulting in a child's removal or continued placement outside of a parent's care will not be remedied, the trial court must judge a parent's fitness to care for her child at the time of the termination hearing while also taking into consideration evidence of changed circumstances. *A.D.S. v. Ind. Dep't of Child Servs.*, 987 N.E.2d 1150, 1156-57 (Ind. Ct. App. 2013). However, the court can "disregard the efforts. . . made only shortly before termination and to weigh more heavily [a parent's] history of conduct prior to those efforts." *In re K.T.K.*, 989 N.E.2d 1225, 1234 (Ind. 2013).

[22] The trial court is also required to consider the parent's habitual patterns of conduct in order to determine the probability of future neglect or deprivation of the child. *ADS,* 987 N.E.2d at 1157. The trial court may consider evidence of a parent's prior history of neglect, failure to provide support, and lack of adequate housing and employment. *Id.* The trial court may consider the services offered to the parent by DCS and the parent's response to those services as evidence of

whether conditions will be remedied. *Id.* DCS is not required to provide evidence ruling out all possibilities of change. *Id.* Instead, it needs to establish only that a "reasonable probability" exists that the parent's behavior will not change. *Id.*

*1. Mother*

[23] Mother specifically challenges finding numbers thirty-three and thirty-nine, which relate to her recent participation in rehab and forty-one days of sobriety at the time of the termination hearing. Mother contends that shortly before the termination hearing, she remedied this condition by completion of an inpatient rehab program, took steps to secure stable housing, and expected to start job orientation the day after the hearing.

[24] In this situation, the Children were removed from Mother and Father's home after the Children were experiencing withdrawal symptoms and P.H.'s meconium tested positive for morphine. Mother had a prior history of substance abuse issues, and DCS was familiar with Mother from prior CHINS cases. In the 2012 and 2014 CHINS cases, Mother was offered substance abuse services and treatment but acknowledged that she never successfully completed any of these programs. It was not until DCS filed its termination petitions to the Children that Mother enrolled in substance abuse treatment. The trial court can "disregard the efforts. . . made only shortly before termination and to weigh more heavily [a parent's] history of conduct prior to those efforts." *In re K.T.K.*, 989 N.E.2d at 1234. The trial court acknowledged Mother's self-reported

progress, and it weighed it accordingly. Mother's argument is simply a request that we reweigh witness credibility and the evidence, which is not within our role as an appellate court. *See In re D.B.*, 942 N.E.2d at 871.

*2. Father*

[25] Father challenges finding numbers twenty-two, twenty-nine, and thirty, which relate to Father's participation in services while incarcerated, his sobriety while incarcerated, and demonstration of skills learned from the provided services. Father specifically argues that he has remedied the conditions that led to removal of the Children because he has participated in services in jail, has maintained his sobriety, and has not been given an opportunity to demonstrate the parenting skills that he has learned.

[26] Although Father participated in a DCS-referred service while he was incarcerated, he failed to consistently participate in substance abuses services and visitation with the Children prior to incarceration. Further, before Father was incarcerated, he failed eight out of nine drug screens. The court's finding regarding DCS not drug testing Father while in prison assumes that Father's sobriety is a result of incarceration, not that he has overcome his substance abuse issues. It is within the trial court's discretion to give more weight to a parent's habitual patterns of conduct in order to determine the probability of future neglect or deprivation of the child. *See ADS,* 987 N.E.2d at 1157. The trial court's finding that case manager Graham stated she was unable to determine if Father could apply the learned parenting skills did not unfairly

penalize Father. Individuals who pursue criminal activity run the risk of being denied the opportunity to develop positive and meaningful relationships with their children. *Castro v. State OFC*, 842 N.E.2d 367, 375 (Ind. Ct. App. 2006). Just like he could not participate in visitation with Children due to his incarceration, case manager Graham could not assess whether Father had made progress in parenting due to Father's incarceration.

*B. Best Interests of the Child*

[27] When determining what is in the best interests of a child, the trial court must look beyond the factors identified by DCS and look to the totality of the evidence. *A.D.S.*, 987 N.E.2d at 1158. In doing so, the court must subordinate the interests of the parent to those of the child. *Id.* The court need not wait until the child is irreversibly harmed before terminating the parent-child relationship. *Id.* A recommendation by the case manager or child advocate to terminate parental rights is sufficient to show by clear and convincing evidence that termination is in the child's best interests. *Id.* at 1158-59. Permanency is a central concern in determining the best interests of a child. *Id.* at 1159.

[28] Mother and Father argue that they have made progress with their substance abuse issues and challenge the court's conclusion that termination of their parental rights is in the Children's best interests.

[29] The Children were six weeks old when they were removed from Mother's and Father's care. Father basically has had no interaction with the Children since

they were removed, and while Mother attended visitation during the CHINS proceedings, she often missed visits, which led to cancellation of these services.

[30] Both case manager Graham and CASA Bowen expressed that termination of parental rights was in the Children's best interests. Case manager Graham emphasized that Mother has had many years to seek treatment for her substance abuse issues but had failed to do so until immediately before the termination hearing. Graham further noted that Father was also ordered to participate in substance abuse services and visitation with the Children prior to incarceration but failed to do so. CASA Bowen stated that the Children are well bonded to their foster parents and the Children are at a critical age to establish permanency and stability. Based on the recommendations from Graham and Bowen, we cannot conclude that the trial court erred in determining that termination of Mother and Father's parental rights to the Children was in the best interests of the Children.

## Conclusion

[31] Although Mother and Father have recently attempted to make positive changes in their lives, it is simply too late in the lives of these children. Mother only recently completed a rehab program after several years of failed attempts. Although she reported maintaining sobriety for forty-one days and having housing and a job lined up after the termination hearing, we defer to the trial court's discretion on the weight given to that evidence. Father remains incarcerated and arguably sober, but this is largely due to the nature of his

incarceration. He has engaged in services while in jail but failed to comply with the Children's case plan prior to incarceration. Applying our highly deferential standard of review in this situation, we cannot conclude that the trial court's decision to terminate Mother and Father's parental rights to Children was clearly erroneous.

[32] Affirmed.

Robb, J., and Brown, J., concur.